CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

SEP 17 2010

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| WILLIAM JOSEPH GUTERSLOH, | ) |
| Petitioner, | ) Case No. 7:10-cv-00083 |
| v. | ) MEMORANDUM OPINION |
| BRIAN WATSON, WARDEN, | ) By: Hon. Glen E. Conrad |
| | ) Chief United States District Judge |
| Respondent. | ) |

The petitioner, an inmate serving a life sentence in a Virginia state prison, filed this pro se petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the validity of his state court convictions of first degree murder and defilement of a human body. The respondent filed a motion to dismiss.[1] Upon review of the record, the court finds that the motion to dismiss must be granted.

I. **Background**

On March 2, 2007, William Joseph Gutersloh ("Gutersloh" or the "petitioner") was convicted by jury in the Circuit Court for the City of Radford of first degree murder and defilement of a human body in connection with the June 2000 death of Lori Pleasants. The Court sentenced him, on the jury's recommendation, to life in prison on the first degree murder conviction and to five years' incarceration for defilement of a human body.

Gutersloh appealed his convictions to the Court of Appeals of Virginia, arguing that the

---

[1] After the respondent filed the motion to dismiss, the court issued a notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), giving Gutersloh until April 27, 2010 to file a response to the motion. On April 23, 2010, the court refused Gutersloh's request to appoint counsel for purposes of his petition but extended his response deadline to May 29, 2010. Gutersloh still failed to file any response. Accordingly, the matter is ripe for determination.

trial court erred in (1) instructing the jurors that they "may infer" that every person intends the natural and probable consequences of his acts, and in (2) denying Gutersloh's motion to strike the first degree murder charge for insufficient evidence. On April 15, 2008, his appeal was denied in a per curiam opinion, which held that Gutersloh had failed to preserve the first assignment of error for appeal and that sufficient evidence supported his conviction for first degree murder. See Gutersloh v. Commonwealth, Record No. 1475-07-3 (Va. App. 2008). A three-judge panel of the Court denied Gutersloh's petition for review on July 24, 2008 for the reasons stated in the per curiam opinion.

Gutersloh appealed to the Supreme Court of Virginia, alleging three grounds for relief: (1) that his due process rights were violated by the trial court's instruction that the jury may infer that a person intends the natural and probable consequences of his acts; (2) that the Court of Appeals erred in ruling that Gutersloh had not preserved for appeal his argument challenging this jury instruction; and (3) that the evidence adduced at trial was insufficient to support a first degree murder conviction. The Court refused Gutersloh's appeal on January 6, 2009, in an order unaccompanied by an opinion. See Gutersloh v. Commonwealth, Record No. 081571 (Va. 2009). Gutersloh's petition for rehearing by the Court was similarly denied on March 10, 2009.

Gutersloh did not file a state habeas petition. On March 1, 2010, he filed the present action in the United States District Court for the Western District of Virginia, asserting that he is entitled to habeas relief on exactly the same grounds that he raised in his appeal to the Supreme Court of Virginia.

## II. Discussion

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court generally cannot grant a writ of habeas corpus for a petitioner who is in custody pursuant to the judgment of a state court unless the petitioner has exhausted the remedies available in the courts of that state. 28 U.S.C. § 2254(b)(1)(A). If the petitioner has not done so, his claims are procedurally defaulted in federal court. Bousley v. United States, 523 U.S. 614, 621 (1998); United States v. Mikalajunas, 186 F.3d 490, 492-93 (4th Cir. 1999). In order to have exhausted his claims in state court, the petitioner must have "fairly presented" each federal claim to the highest state court. Matthews v. Evatt, 105 F.3d 907, 911 (4th Cir. 1997). "A claim is fairly presented when the petitioner presented to the state courts the 'substance of his federal habeas corpus claim.'" Id. (quoting Anderson v. Harless, 459 U.S. 4, 6 (1982)).

AEDPA also provides that a federal court may grant a habeas petition only if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceeding." 28 U.S.C. § 2254(d); Booth-El v. Nuth, 288 F.3d 571, 575 (4th Cir. 2002). As the Supreme Court has clarified, "an unreasonable application of federal law is different from an incorrect application of federal law." Williams v. Taylor, 529 U.S. 362, 410 (2000) (emphasis in original). Thus, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. The error must be objectively

unreasonable before a federal court can grant habeas relief. Lockyer v. Andrade, 538 U.S. 63, 76 (2003). As a result, a federal court cannot grant the writ merely for clear error, because even a clearly erroneous application of federal law is not necessarily objectively unreasonable. Id. at 75. Moreover, because § 2254(d) mandates a "highly deferential standard for evaluating state-court rulings," "state-court decisions [must] be given the benefit of the doubt." Woodford v. Visciotti, 537 U.S. 19, 24 (2002). Accordingly, "a determination on a factual issue made by a State court shall be presumed correct," and the burden is on the petitioner to rebut this presumption "by clear and convincing evidence." Tucker v. Ozmint, 350 F.3d 433, 439 (4th Cir. 2003).

The Court of Appeals' opinion of April 15, 2008 is the "last explained state-court judgment," so the court looks to its reasoning in order to adjudicate Gutersloh's present claims. Ylst v. Nunnemaker, 501 U.S. 797, 805 (1991). See also Bush v. Legursky, 966 F.2d 897, 899-900 (4th Cir. 1992). Because there is no dispute that Gutersloh has exhausted state court remedies for the claims he now brings before the court, the court considers each of them in turn.

The court bears in mind that it must hold pleadings filed by a pro se litigant "to less stringent standards than formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520 (1972). The requirement of liberal construction does not mean, however, that the court can ignore a clear failure in the pleading to "allege anything that remotely suggests a factual basis for the claim." Weller v. Department of Social Servs., 901 F.2d 387, 391 (4th Cir. 1990). Similarly, "judges are not . . . required to construct a [pro se] party's legal arguments for him." Small v. Endicott, 998 F.2d 411, 417-18 (7th Cir. 1993). Likewise, the court is not required to "attempt[] to divine the point" the litigant seeks to make about the specific facet of the criminal proceedings that he challenges. Id. Where the petitioner's motion, when viewed against the record, does not

4

state a claim for relief, the court should summarily dismiss the motion. Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

    A.    <u>Jury Instruction 6B</u>

Gutersloh first asserts as a ground for relief the trial court's decision to give Jury Instruction 6B to the jury, which read as follows: "You may infer that every person intends the natural and probable consequences of his acts." When Gutersloh initially raised this argument before the Court of Appeals of Virginia, however, the Court held that his argument was procedurally barred under Virginia Supreme Court Rule 5A:18:

> In objecting [at trial] to the proferred instruction, [Gutersloh] made no mention of any constitutional defects in the instruction, nor did he argue with specificity what clarification he sought or how and why the instruction was an incorrect statement of the law. Therefore, the trial court had no opportunity to consider the issue presented on appeal. Because appellant did not object to the proposed instruction with specificity, he has waived this issue on appeal.

Gutersloh, Record No. 1475-07-3, at *2.[2]

It is clearly established that "[w]hen a state-law default prevents the state court from reaching the merits of a federal claim, that claim can ordinarily not be reviewed in federal court." Ylst, 501 U.S. at 801. A federal <u>habeas</u> court may not, in other words, review a petitioner's claims when a state court has declined to review them on the merits "pursuant to an independent and adequate state procedural rule" unless the prisoner can demonstrate either cause for the default and resulting prejudice, or that the failure to consider the claims will result in a

---

[2] At the time of Gutersloh's appeal, Rule 5A:18 provided as follows:
No ruling of the trial court or the Virginia Workers' Compensation Commission will be considered as a basis for reversal unless the objection was stated together with the grounds therefor at the time of the ruling, except for good cause shown or to enable the Court of Appeals to attain the ends of justice. A mere statement that the judgment or award is contrary to the law and the evidence is not sufficient to constitute a question to be ruled upon on appeal.
Va. Sup. Ct. Rule 5A:18 (2008).

fundamental miscarriage of justice. Coleman v. Thompson, 501 U.S. 722, 750 (1991).

Whether a particular state procedure is independent and adequate is a question of federal, not state, law. See Johnson v. Mississippi, 486 U.S. 578, 587 (1988). "A state rule is adequate if it is firmly established and regularly or consistently applied by the state court, and independent if it does not depend on a federal constitutional ruling." Brown v. Lee, 319 F.3d 162, 169 (4th Cir. 2003) (citations omitted). There is no question that Rule 5A:18 is firmly established in Virginia law or that it is independent of a federal constitutional ruling.

Furthermore, Gutersloh has made no showing that the Court of Appeals of Virginia has applied Rule 5A:18 in an inconsistent manner. "Consistent or regular application of a state rule of procedural default does not require that the state court show an undeviating adherence to such rule admitting of no exception, when the state procedural rule has, as a general rule, . . . been applied in the vast majority of cases." Yeatts v. Angelone, 166 F.3d 255, 263-64 (4th Cir.1999) (internal quotation marks and citations omitted). Given that the Court of Appeals has regularly applied Rule 5A:18 to circumstances similar to those in the case at bar, there is no reason to believe that the Court's application of Rule 5A:18 has been inconsistent. See, e.g., Kilby v. Commonwealth, 663 S.E.2d 540, 546 n. 5 (Va. App. 2008) (defendant's objection to an expert's qualifications did not preserve an argument that the expert's theory was not a proven scientific technique); Edwards v. Commonwealth, 589 S.E.2d 444, 447 (Va. App. 2003) (en banc) (defendant did not preserve his argument that assault of a law enforcement officer and attempted capital murder charges were distinguished by the statutory definition of a "law enforcement officer" when he argued at trial only that the assault charge required proof that an assailant perceived the victim to be a law enforcement officer, whereas attempted capital murder did not

require this proof); West v. Commonwealth, 597 S.E.2d 274, 278-79 (Va. App. 2004) (defendant did not preserve an objection on double jeopardy grounds when he did not specifically state the grounds of his objection).

The United States Court of Appeals for the Fourth Circuit has held that Virginia Supreme Court Rule 5:25, which governs the Supreme Court of Virginia's review of error, is an independent and adequate state procedural bar that precludes habeas review of errors that a petitioner has not raised at trial. Weeks v. Angelone, 176 F.3d 249, 270 (4th Cir. 1999). Several Virginia courts have observed that Rule 5A:18, which governs the ability of the Court of Appeals of Virginia to review error, is "virtually identical" to Rule 5:25. Jimenez v. Commonwealth, 402 S.E.2d 678, 680 (Va. 1991). See also Brown v. Commonwealth, 688 S.E.2d 185, 189 (Va. 2010) (treating Rule 5:25 as the "counterpart" of Rule 5A:18); Perez v. Commonwealth, 580 S.E.2d 507, 513 n. 8 (Va. App. 2003) (Agee, J., concurring) ("For present purposes, I assume Rules 5:25 and 5A:18 are interchangeable and what is said in application to one applies to the other.").

Accordingly, the court concludes that Rule 5A:18 is an independent and adequate state law basis for procedural default. See King v. Dean, 955 F.2d 41, 1992 WL 29295, at n. * (4th Cir. 1992) (table) (holding that Rule 5A:18 is an adequate and independent state law basis for procedural default); Guerera-Sandoval v. Johnson, 2010 WL 2024549, at *3 (E.D. Va. 2010) (same); Williams v. Dillman, 2010 WL 723111, at *4 (E.D. Va. 2010) (same). See also Clagett v. Angelone, 209 F.3d 370, 378-79 (4th Cir. 2000). Gutersloh does not argue that there was cause for his default or that the failure to consider his claim would result in a fundamental miscarriage

of justice.[3] His claim must therefore be dismissed.

In any event, it is clear that his argument fails on the merits. Gutersloh argues that Jury Instruction 6B deprived him of his due process right against conviction except upon proof beyond a reasonable doubt by inappropriately relieving the State of its burden of proof with regard to Gutersloh's intent. Relying on Sandstrom v. Montana, 442 U.S. 510 (1979), Gutersloh claims that Instruction 6B's statement that the jury "may infer" that Gutersloh intended the natural and probable consequences of his actions created a mandatory presumption that instructed the jury that they <u>must</u> infer that he intended the natural and probable consequences of his conduct. As the respondent correctly observes, however, the Supreme Court has made it abundantly clear that, while mandatory presumptions may violate a defendant's due process rights,

> [a] permissive inference does not relieve the State of its burden of persuasion because it still requires the State to convince the jury that the suggested conclusion should be inferred based on the predicate facts proved. . . . A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury.

Francis v. Franklin, 471 U.S. 307, 314-15 (1985). There is no serious doubt, despite Gutersloh's contorted constructions of the word "may," that the language of Instruction 6B constitutes only a permissive inference that did not impermissibly shift the burden of persuasion to the defendant. See Peterson v. Murray, 904 F.2d 882, 888 (4th Cir. 1990) (holding that a jury instruction did not impermissibly shift the burden of production when it told the jury, "You may infer malice from

---

[3] Even in the event that Gutersloh's sufficiency of the evidence argument is construed as a claim that "a constitutional violation has probably resulted in the conviction of one who is actually innocent," Reid v. True, 349 F.3d 788, 806 (4th Cir. 2003), this argument would fail because he has neither presented "new reliable evidence . . . that was not presented at trial," nor shown "that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." Schlup v. Delo, 513 U.S. 298, 324, 327-328 (1995).

8

the deliberate use of a deadly weapon unless, from all the evidence, you have a reasonable doubt as to whether malice existed."); Davis v. Allsbrooks, 778 F.2d 168, 172-73 (4th Cir. 1985). Even on the merits, therefore, Gutersloh's claim must fail.

B.   The Court of Appeals' Application of Rule 5A:18

Gutersloh's second asserted ground for relief is that the Court of Appeals of Virginia erred in holding that Rule 5A:18 barred the Court from reviewing Gutersloh's claim of error regarding Instruction 6B. Gutersloh does not assert that the Court of Appeals' application of Rule 5A:18 violated his federal due process rights; rather, he simply cites Virginia state law to argue that the Court of Appeals erred in finding that he had not preserved his objection at trial with the requisite specificity. In essence, therefore, Gutersloh's claim is that the Court improperly interpreted a rule of state law.

It is fundamental, however, that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). See also Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). Because Gutersloh alleges only an error of state law with respect to this ground for relief, his claim is not cognizable on federal habeas and must be dismissed.

### C. Sufficiency of the Evidence

Finally, Gutersloh asserts that the evidence adduced at his trial was insufficient to support a conviction for first degree murder under Virginia law. "[T]he Due Process Clause of the Fourteenth Amendment protects a defendant in a [state] criminal case against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." Jackson v. Virginia, 443 U.S. 307, 315 (1979) (quotation marks and citation omitted). In determining on habeas review whether the record evidence supports a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319. AEDPA adds another layer to the Jackson analysis, such that a federal habeas court must now "inquire whether a state court determination that the evidence was sufficient to support a conviction was an objectively unreasonable application of [the standard enunciated in] Jackson." Williams v. Ozmint, 494 F.3d 478, 489 (4th Cir. 2007) (quoting Sarausad v. Porter, 479 F.3d 671, 677 (9th Cir. 2007)). Moreover, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326.

Under Virginia law, first degree murder includes "any willful, deliberate, and premeditated killing." VA. CODE § 18.2-32. "Generally, a conviction for premeditated murder under this statute requires proof of: '(1) a killing; (2) a reasonable process antecedent to the killing, resulting in the formation of a specific intent to kill; and (3) the performance of that act with malicious intent.'" Aldridge v. Commonwealth, 606 S.E.2d 539, 557 (Va. App. 2004)

(quoting Rhodes v. Commonwealth, 384 S.E.2d 95, 98 (Va. 1989). Virginia courts are clear that premeditation may arise "at the time of the murder." Beck v. Commonwealth, 342 S.E.2d 642, 646 (Va. App. 1986). Thus, the design to kill "need not exist for any specified length of time prior to the actual killing," but may be formed "only a moment before the fatal act is committed provided that the accused had time to think and did intend to kill." Clozza v. Commonwealth, 321 S.E.2d 273, 279 (Va. 1984). See also Green v. Commonwealth, 580 S.E.2d 834, 847 (Va. 2003) ("Premeditation is an intent to kill that needs to exist only for a moment."). "In deciding the question, the jury properly may consider the brutality of the attack, whether more than one blow was struck, the disparity in size and strength between the accused and the victim, the concealment of the victim's body, and the defendant's efforts to avoid detection." Clozza, 321 S.E.2d at 279.

In this case, the evidence at trial, when taken in the light most favorable to the Commonwealth, proved that Lori Pleasants had hosted a small party at her apartment in the early morning hours of June 15, 2000. Jeff Jones, who was at the party, testified that Gutersloh was at the party and that, when Jones left at about 3:00 a.m., Gutersloh and Pleasants were the only two people left in the apartment who were still awake. Jones testified that he heard the deadbolt lock behind him as he left. Three of Gutersloh's acquaintances each testified at trial that Gutersloh burst into a fraternity party later that same morning, looking shaky, excited, and breathless. Two of them, Jerome Turner and Michael Kirk, who were Gutersloh's fraternity brothers, testified that Gutersloh said that he was being hunted by the police and that he asked them to say that he had been at the fraternity party all night. The body of Lori Pleasants was discovered the next day, lying on her bed with her wrists cut, clutching a kitchen knife.

11

Dr. Wanger, the medical examiner who performed the autopsy on Pleasants' body, testified that she died from strangulation. Noting that Pleasants' neck had suffered abrasions that were consistent with the pattern of a wire necklace that she was wearing, Wanger also testified that Pleasants' lips and eyelids bore small hemorrhages that were "consistent with strangulation" in that they "occur when the neck veins are collapsed but the arteries are kept open." Wanger stated that Pleasants could have suffered these injuries if pressure was applied to her neck, cutting off the supply of oxygen to her brain. In this scenario, Pleasants' death would have taken longer than she could hold her breath. Pleasants could also have suffered these injuries, Wanger said, if the pressure on Pleasants' neck rubbed certain sensitive carotid nerve bodies, causing her heart to beat irregularly. In this case, her death could have occurred quite quickly. Although Wanger did not rule out this latter possibility, he observed that super-sensitive carotid bodies exist predominantly only in the elderly or in individuals with a history of drug abuse or hypertensive heart disease. As a result, Wanger did not opine on exactly how long it took for Pleasants to be strangled to death, indicating only that it was possible for death to have occurred "very fast" or in a matter of "minutes."

Wanger also testified that the wounds to Pleasants' wrists were postmortem, given his analysis of the blood clotting and bruising around the wounds. He testified as well that there were a number of changes on the body and the scene, "which would support that the scene is staged."

Three different friends of Gutersloh also testified that he had confessed the crime to each of them in subsequent years. Keith Ackerly, a former supervisor of Gutersloh, testified that, in 2000 or 2001, Gutersloh told him that he had previously killed a girl in Radford. According to Ackerly, Gutersloh told him that he had gone to collect a debt, got into a physical argument with

12

a girl, and that "he'd snapped, he had grabbed the girl by the throat and that he had choked her." Ackerly also testified that, after Gutersloh had realized that the girl was dead, "he panicked and he grabbed a knife and . . . cut her wrist to make it look like suicide," being careful to "wipe[] everything clean" and "carr[y] off any evidence that he might have left behind."

Fred Schmidt, one of Gutersloh's childhood friends, testified that in 2001, Gutersloh told Schmidt that he and a girl "were in an intimate situation" and that Gutersloh "began to choke her and just sort of snapped and continued to do so until she was dead." Schmidt testified that "the reason [Gutersloh] said he continued to do so was because he was afraid that if he stopped choking her that she would have went to the police." Schmidt was adamant on cross-examination that "[Gutersloh] said, it wasn't an accident. He said that he started strangling her because something just clicked in his mind." On re-direct, moreover, Schmidt read into evidence a portion of his grand jury testimony, in which he had stated that Gutersloh "just grabbed on, and then he said that he just kept doing it because he was afraid that she would have said something if he had tried strangling her and he just kept doing it, and doing it, and doing it, and just didn't stop." Schmidt further indicated that Gutersloh later threatened to harm Schmidt's family if he ever told anyone what Gutersloh had said.

Robert Meade, another of Gutersloh's childhood friends, testified that in 2000 or 2001, Gutersloh told him that he had killed Pleasants and "slit her wrists with a kitchen knife and . . . cleaned up the scene afterwards [to make] it look like she committed suicide." Meade testified that he later had "hundreds" of conversations with Gutersloh about the crime, in which Gutersloh repeatedly told him not to tell anyone about it.

The court cannot conclude that it was objectively unreasonable for the Court of Appeals

13

to find that this evidence was sufficient for a rational fact-finder to convict Gutersloh of first degree murder under Virginia law. Gutersloh argues that the evidence was insufficient to show premeditation, because it did not establish the minimum time required to cause Pleasants' death and did not exclude the "reasonable hypothesis that death could have been caused by accident or sudden impulse." (Pet. Br. at 11.) But it is obvious that the jury could have rationally concluded from the evidence presented at trial that, after Gutersloh began choking Pleasants, he "just didn't stop" and, in order to prevent her from going to the police, continued strangling her for some "minutes" until she died. As the Court of Appeals rightfully noted, "[n]o evidence suggested the murder was an accident or that [Gutersloh] acted in self-defense or in the sudden heat of passion." See Gutersloh, Record No. 1475-07-3, at *7.

In any event, Virginia law is clear that all that is needed for premeditation is enough "time to think" about the killing. Clozza, 321 S.E.2d at 279. Cogitation takes but a moment. There was no indication at trial that Pleasants could have died instantaneously from the manual pressure applied to her neck, even if her carotid bodies were super-sensitive. Therefore, "[t]he fact that the decedent died from manual strangulation and suffocation, which in themselves required some prolonged physical effort by appellant" suggests that Gutersloh acted with premeditation. Beck, 342 S.E.2d at 646. Moreover, Gutersloh's "efforts to avoid detection" in placing Pleasants' body on the bed, slashing her wrists with a knife he procured from the kitchen, and wiping the scene clean of evidence that implicated him in the murder also weigh in favor of finding premeditation under Virginia law. See Clozza, 321 S.E.2d at 279.

The court therefore concludes that the Court of Appeals of Virginia did not unreasonably apply clearly-established federal law or make an unreasonable determination of the facts when it

14

held that the evidence produced at trial in this case was enough for a rational fact-finder to conclude that Gutersloh killed Pleasants with premeditation. This claim, too, must be dismissed.

## IV. Conclusion

For these reasons, the court concludes that the motion to dismiss must be granted.

The petitioner is advised that he may appeal this decision pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure, if a judge of the circuit court of appeals or of this court issues a certificate of appealability, pursuant to 28 U.S.C. § 2253(c). A certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right. § 2253(c)(1). Petitioner has failed to demonstrate "a substantial showing of the denial of a constitutional right." Therefore, this court declines to issue any certificate of appealability pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure. See Miller-El v. Cockrell, 537 U.S. 322 (2003); Slack v. McDaniel, 529 U.S. 473 (2000). If petitioner intends to appeal and seek a certificate of appealability from the United States Court of Appeals for the Fourth Circuit, his first step is to file a notice of appeal with this court within 30 days of the date of entry of this memorandum opinion and the accompanying order, or within such extended period as the court may grant pursuant to Rule 4(a)(5).

The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to the defendant and to counsel of record for the respondent.

ENTER: This 17th day of September, 2010.

_____
Chief United States District Judge